**Supreme Court**

No. 2011-281-Appeal.
No. 2012-308-Appeal.
(PM 09-5598)

In re Irving Briggs.                    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

In re Irving Briggs. : No. 2011-281-Appeal.
No. 2012-308-Appeal.
(PM 09-5598)

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.** The issue before this Court revolves around the propriety of the transfer of Irving Briggs by the Department of Mental Health, Retardation and Hospitals[1] (department) to the Adult Correctional Institutions (ACI) under G.L. 1956 chapter 5.3 of title 40.1. Pursuant to § 40.1-5.3-9, the director of the department petitioned the Superior Court for an emergency transfer of Briggs, a sentenced inmate, from the Forensic Unit of the Eleanor Slater Hospital—where he was receiving specialized mental-health services as a psychiatric inpatient—back to the ACI where he previously had been incarcerated. On behalf of Briggs, the Mental Health Advocate[2] objected to the transfer. Before this Court, Briggs contends that his emergency transfer to the ACI, in the absence of a full evidentiary hearing, violated his procedural due-process rights. He further argues that, based on allegations that the department

---

[1] After the Superior Court proceedings in this matter, the Rhode Island General Assembly changed the name of the Department of Mental Health, Retardation and Hospitals to the "Department of Behavioral Healthcare, Developmental Disabilities and Hospitals." We will simply use the term "the department" in this opinion.

[2] The statutes setting forth the duties of the Mental Health Advocate include G.L. 1956 §§ 40.1-5-13, 40.1-5-22, and 40.1-5-24. The Mental Health Advocate's duties include, among others, "[i]nsur[ing] that each person in treatment * * * is apprised of his or her rights under this chapter" and "[a]ct[ing] as counsel for all indigent persons * * * relating to the application of the provisions of this chapter, including, but not limited to, judicial proceedings hereunder." Section 40.1-5-22(1), (6).

contrived the emergency precipitating his transfer, the trial justice erred in denying his motion for sanctions under Rule 11 of the Superior Court Rules of Civil Procedure.

This case came before this Court on February 27, 2013, pursuant to an order directing the parties to show cause why the issues raised in this appeal should not summarily be decided. After considering the parties' written and oral submissions and after reviewing the record, we conclude that cause has not been shown and that this case may be decided without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I
## Facts and Travel

Briggs was convicted of three counts of first-degree sexual assault after a jury-waived trial, and on October 6, 2003, he was sentenced to serve sixty years imprisonment. In September 2009, while incarcerated at the ACI, Briggs was evaluated by Dr. Jody Underwood, a psychiatrist employed by the Rhode Island Department of Corrections. In the psychiatrist's opinion, Briggs was suffering from a serious mental illness and, at that time, was in need of the therapeutic setting of a psychiatric hospital. After a petition was filed with the Superior Court, Briggs was transferred to the Forensic Unit on September 24, 2009, by order of a trial justice, pursuant to § 40.1-5.3-6.[3]

---

[3] General Laws 1956 § 40.1-5.3-6, entitled "Examination of persons awaiting trial or convicted and imprisoned for crime," provides:
> "On a petition of the director of the department of mental health, retardation, and hospitals, or on the petition of the director of the department of corrections, setting forth that any person awaiting trial or convicted of a crime and imprisoned for the crime in the adult correctional institutions is mentally ill and requires specialized mental health care and psychiatric in-patient services which cannot be provided in a correctional facility, a justice of the

However, Briggs did not encounter smooth sailing while he was hospitalized. On November 2, 2009, the department sought emergency relief from the Superior Court for the transfer of Briggs back to the ACI under § 40.1-5.3-9.[4] The allegations that constituted the perceived emergency were set forth in a letter addressed to the Mental Health Advocate and signed by the associate director of the department. This letter, dated November 2, 2009, starkly declared that Briggs's "continued presence at the Forensic Unit of [Eleanor Slater Hospital] presents a clear health and safety risk to the other patients and staff on the ward." The letter also said that the department "has assessed Mr. Briggs and [it has] determined that he does not require specialized psychiatric services at the Forensic Unit of the [Eleanor Slater Hospital] and can receive appropriate care at the ACI," and that "[t]he Department of Corrections has evaluated Mr. Briggs and they are in agreement that he is not in need of specialized psychiatric services at the [Eleanor Slater Hospital] and can be transferred back to the ACI to serve the remainder of his sentence." Finally, the letter provided that the department would be appearing before a Superior Court justice "to petition the court on an emergency basis to transfer Irving Briggs (10/7/68) back to the ACI" that day.

Despite the short notice, the Mental Health Advocate appeared in court on behalf of Briggs.[5] The trial justice held a conference with both attorneys in his chambers that was not recorded, and after the conference, the parties articulated their arguments on the record. The

superior court may order the examination of the person as in his or her discretion he or she shall deem appropriate."

[4] Section 40.1-5.3-9, entitled "Return to confinement," provides:

"When any person transferred pursuant to § 40.1-5.3-7 has sufficiently recovered his or her mental health, he or she may, upon petition of the director and by order of a justice of the superior court in his or her discretion, be transferred to the place of his or her original confinement, to serve out the remainder of his or her term of sentence."

[5] Briggs was not present at the conference.

department's counsel argued that Briggs had attempted to strangle another patient in the Forensic Unit, that the director was concerned about patient safety, and that the staff no longer wanted to be on the unit with Briggs. He explained that Briggs's most recent hostile actions were directed at a nurse and that that serious incident had taken place over the weekend. Also, concern was expressed about threats directed toward a treating psychiatrist that had occurred within the previous week. The department's counsel explained that Briggs's behavior was becoming more aggressive and that it was the opinion of the department physicians that Briggs had been feigning psychiatric symptoms because there was a possibility that he would be moved back to the ACI. Based on his increased aggression that seemed to be correlated to his potential transfer, the department's counsel expressed worry that Briggs would likely increase his dangerous behavior if he were to learn of a pending transfer hearing.[6] The Mental Health Advocate objected to the proceeding. He questioned the credibility of the department's presentation that this was in fact an emergency situation, and he argued that the department must file a petition and a hearing must be held before Briggs could be moved back to the ACI, pursuant to § 40.1-5.3-9.

After hearing from the parties, the trial justice observed that § 40.1-5.3-9 was silent about whether a hearing should be provided in the case of an inmate being returned to the ACI, and that chapter 5.3 of title 40.1 was devoid of any direction as to how to proceed in an emergency. The trial justice deferred to the decision of another Superior Court justice in 2002 that concluded

---

[6] The department's counsel also asserted in chambers—based on information supposedly gleaned from Briggs himself—that Briggs was wanted in Illinois for two murders. However, as of November 5, 2009, the information about the two alleged murders was acknowledged to be inaccurate. The trial justice rebuked the department about this misinformation, stating that he was "a bit troubled that it certainly was represented that Mr. Briggs had committed two murders in the State of Illinois. * * * The fact that there was some misleading with regard to that is troubling, I cannot emphasize that enough." However, he explained that the incorrect information about the two murders "was not [his] sole motivating factor" for granting the emergency transfer. He indicated that he considered "[Briggs's] violence while [i]n the forensic unit, [and the] personal safety and welfare of both the staff and the other inmates."

- 4 -

that inmates being moved from the Forensic Unit back to the ACI should be entitled to evidentiary hearings similar to those conducted pursuant to §§ 40.1-5.3-6 and 40.1-5.3-7, which mapped out the procedure to be followed when transferring an inmate from the ACI to the Forensic Unit.[7]  Against this background, and after noting that the procedure for an emergency transfer from the Forensic Unit back to the ACI was an issue of first impression, the trial justice weighed the potential harm to Briggs if he were immediately transferred against the potential harm that could occur to others if he were to remain at the Forensic Unit.  The trial justice concluded that "[i]f the court is not allowed to transfer, there may be some chaos or, at worse, some serious injury that results."

To support his decision to allow the transfer in advance of a full evidentiary hearing, the trial justice cited Cleveland Board of Education v. Loudermill, 470 U.S. 532, 545 (1985), which provides that "[i]n general, 'something less' than a full evidentiary hearing is sufficient" in the pre-deprivation context.[8]  The trial justice noted that Briggs had been afforded some due process before his transfer: counsel for Briggs had been provided with notice of the emergency hearing, counsel had been able to participate in a chambers conference, and counsel had been given the opportunity to place her concerns on the record.  Based on this reasoning, the trial justice ordered

---

[7] In the trial justice's decision, dated February 19, 2010, he discussed administrative order 86-1, which addresses emergency transfers to the Forensic Unit pursuant to § 40.1-5.3-6, and suggested that it should also apply to transfers under § 40.1-5.3-9.

[8] In Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985), the United States Supreme Court considered the due-process rights to be afforded to a public employee before the employee is terminated.  Id.  The Court stated that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."  Id.  The Court further opined that while a pre-termination "hearing" is necessary, it "need not be elaborate," and that "[i]n general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action."  Id. at 545.

the transfer of Briggs forthwith to the ACI; however, he set the matter down for a post-transfer evidentiary hearing on November 5, 2009—just three days later.

On November 5, 2009, although the department was ready to proceed with a hearing, the Mental Health Advocate indicated that he was making a "formal request * * * [to] stay, or in the alternative, actually vacate the order * * * [the trial justice] heard on [November 2, 2009], transferring Mr. Briggs to prison." The department opposed the motion, and the trial justice took the arguments under advisement. The next day, he issued a bench decision that denied both the Mental Health Advocate's motion to reconsider as well as the request to transfer Briggs back to the Forensic Unit.[9] The post-transfer evidentiary hearing was then scheduled for November 23, 2009, but it was later rescheduled to November 30, 2009, and then again to December 2, 2009.

The hearing commenced on December 2, 2009, and continued to December 10, 2009; January 11, 12, 13, 15, 22, and 29, 2010; and February 5, 2010.[10] During the hearing, testimony was presented by Dr. Pedro F. Tactacan, an attending psychiatrist at the Forensic Unit, and Dr. Underwood, a psychiatrist with the Rhode Island Department of Corrections, about whether Briggs needed any further specialized mental-health services or psychiatric inpatient services. Specifically, Dr. Tactacan testified that Briggs did not presently suffer from a disorder that required inpatient psychiatric hospitalization and treatment. He gave the opinion that Briggs was manipulative and that his behavior was simply an attempt to remain at the Forensic Unit. Similarly, Dr. Underwood, who originally recommended that Briggs be transferred to the

---

[9] Briggs immediately appealed, but a duty justice of this Court declined to issue a stay, noting that an evidentiary hearing was pending in the Superior Court. That appeal is now consolidated with this appeal.

[10] Regrettably, the record does not include transcripts from the December 2 and 10, 2009 hearings.

Forensic Unit, testified that Briggs's symptoms were in remission due to his medication regimen while he was being treated at the Forensic Unit.

Testimony was also presented about the safety concerns at the Forensic Unit by Dr. Tactacan; Joseph Monteiro, a mental-health worker at the Forensic Unit; Ralph Gibbs, a mental-health worker at the Forensic Unit; Erin Benfante, a registered nurse at the Forensic Unit; and Dr. Charlene Tate, the Medical Director and Chief of Clinical Services at the Forensic Unit. Doctor Tactacan testified mostly about the technical components of Briggs's psychiatric analysis, but he also discussed various threats made by Briggs, as well as his manipulative nature. This information was based on Dr. Tactacan's own one-on-one interactions with Briggs and information gleaned from individuals who appeared to be in fear of Briggs.

Monteiro, who was assigned to provide one-on-one supervision of Briggs, testified about one particular incident in which one patient engaged in some inappropriate touching of Briggs, which resulted in a violent outburst. He also testified that he had come to know Briggs, but he did not find Briggs to be a volatile and dangerous individual, which was contrary to what he had been told by other staff members.

Gibbs, who was also assigned to provide one-on-one supervision of Briggs, testified about an incident involving Nurse Benfante, in which Briggs followed Nurse Benfante back to the nurses' station and punched an office window after the pair had engaged in a verbal altercation, precipitated because Briggs had draped a sheet over his head in violation of hospital policy. Nurse Benfante also testified about that incident, and she related Briggs's specific threats

that he was going to turn the ward upside down and that there was nothing the ward could do to prevent him from getting to her.[11]

Finally, Dr. Tate testified. She explained that she was aware of the problems with Briggs, which were escalating, and she expressed concern for the safety of patients and staff. She explained that the most significant incident was the one involving Nurse Benfante and that, based on all the information she had from Nurse Benfante and others, it was her opinion that they needed to remove Briggs from the Forensic Unit.

On February 5, 2010, after the last witness had testified, the Mental Health Advocate filed a motion to impose sanctions under Rule 11. In his motion, the Mental Health Advocate alleged misconduct by the department, specifically arguing that the department and the administration of Eleanor Slater Hospital had "contrived a materially inaccurate set of facts in furtherance of a conspiracy to secure a court order for the immediate discharge of [Briggs] from Eleanor Slater Hospital." The department opposed this motion and argued that uncontroverted evidence was presented by two highly qualified medical experts that Briggs was not in need of the Forensic Unit's specialized services. The department also argued that the testimony presented during the hearing supported that Briggs's behavior had created an escalating tension on the Forensic Unit and resulted in at least a perceived emergency by November 2, 2009.

On February 19, 2010, the trial justice issued a written decision on the underlying merits and the motion for Rule 11 sanctions. After reviewing the testimony about Briggs's psychiatric condition, the trial justice found "the testimony of [Dr. Tactacan and Dr. Underwood] * * * credible and forthright," and that "[a]t the present time, as well of November 2, 2009, a preponderance of evidence indicates that [Briggs] has sufficiently recovered his mental health

---

[11] Incident reports relating to Briggs were also submitted into evidence and reviewed by the trial justice.

and is no longer in need of specialized psychiatric services that can only be provided at the Forensic Unit." The trial justice noted that "[t]his particular point was conceded by the Mental Health Advocate at final argument."[12]

In examining the Mental Health Advocate's allegation that the trial justice had been misled about the circumstances surrounding the need to immediately order Briggs back to the ACI prior to a hearing, the trial justice summarized the testimony of each witness and assessed their credibility. The trial justice found that "Dr. Tactacan was very detailed and confident in his testimony regarding his psychiatric analysis of [Briggs]." He indicated that Dr. Tactacan's "actual testimony as to his own fears falls short of what appears in his affidavit," and that some of the incidents in Dr. Tactacan's affidavit that described Briggs's alleged assaultive and dangerous behavior was "in some contrast" to the incident reports that were submitted on February 5, 2010. The trial justice also noted that Monteiro and Gibbs testified that "their experiences with [Briggs] were not consistent with the information they previously heard about" Briggs's potential volatile nature. He found Nurse Benfante "clearly appeared to be distraught and in fear" and that she "appeared sincere" in her testimony. Finally, the trial justice noted that he was "impressed with the credibility and sincerity of Dr. Tate," and that "[i]t [wa]s very clear to the Court that she was very concerned with the safety of the Forensic Unit."

The trial justice ultimately summarized his findings, in pertinent part, as follows:

> "1) The emergency described by [the department] on November 2, 2009, was not as acute as initially represented.
> "2) The concern of Dr. Tate for the safety and security of the Forensic Unit and patients and staff in such Unit was credible and sincere.

---

[12] Indeed, the Mental Health Advocate conceded to the trial justice that he "could not find a doctor on the planet who could look at Mr. Briggs and his psychiatric condition, and conclude that he still needs to be in a hospital," and, therefore, "the merits of this case [were] no longer in issue."

"3)    Nurse Benfante's distress is sincere.  However, the Court is unsure of how much of a rational basis exists for her distress.  The Court cautions that the rational basis is a matter of degree in the context of this case.

"4)    Dr. Tactacan's concern for the safety and security of the Forensic Unit and the staff and patients is also credible and sincere."

Based on these findings, the trial justice "decline[d] to find a conspiracy among [the department] staff and administration to remove [Briggs] from the Forensic Unit at any and all costs."

On March 15, 2010, Briggs timely appealed to this Court.  The issues before this Court are whether Briggs was afforded procedural due process and whether Rule 11 sanctions should have been imposed against the department.

## II
## Standard of Review

This Court applies "a <u>de novo</u> standard of review * * * to questions of law, as well as to mixed questions of fact and law that purportedly implicate a constitutional right."  <u>Richards v. Fiore</u>, 57 A.3d 254, 257 (R.I. 2012) (quoting <u>State v. Wiggins</u>, 919 A.2d 987, 989 (R.I. 2007)).  This Court also applies a <u>de novo</u> review to questions of statutory interpretation.  <u>Webster v. Perrotta</u>, 774 A.2d 68, 75 (R.I. 2001).  Finally, this Court reviews a trial justice's decision to award or deny Rule 11 sanctions under an abuse-of-discretion standard.  <u>Pleasant Management, LLC v. Carrasco</u>, 918 A.2d 213, 217 (R.I. 2007).

## A
## Justiciability

There is a threshold issue in this case about whether the matter is justiciable under the mootness doctrine.  <u>See</u> <u>Swain v. Estate of Tyre ex rel. Reilly</u>, 57 A.3d 283, 289 (R.I. 2012).  This Court has held that "[a] case is moot if it raised a justiciable controversy at the time the complaint was filed, but events occurring after the filing have deprived the litigant of an ongoing

stake in the controversy." City of Cranston v. Rhode Island Laborers' District Council, Local 1033, 960 A.2d 529, 533 (R.I. 2008) (quoting Seibert v. Clark, 619 A.2d 1108, 1110 (R.I. 1993)). Briggs concedes that the merits of the underlying matter are moot; however, he argues that the procedural issues raised are capable of repetition yet evading review.

"Although it is not the role of this Court to consider 'moot, abstract, academic, or hypothetical questions,' this rule is not absolute." In re Tavares, 885 A.2d 139, 147 (R.I. 2005) (quoting In re Stephanie B., 826 A.2d 985, 989 (R.I. 2003)). "An exception exists when the issue before this Court is one of great public importance that, although technically moot, is capable of repetition yet evading our review." Id. This exception to the mootness doctrine involves a two-pronged test. First, a petitioner must demonstrate that the case is of "extreme public importance." Rhode Island Laborers' District Council, Local 1033, 960 A.2d at 533. Circumstances that satisfy this first prong "will usually implicate 'important constitutional rights, matters concerning a person's livelihood, or matters concerning citizen voting rights.'" Id. at 533-34 (quoting Cicilline v. Almond, 809 A.2d 1101, 1106 (R.I. 2002)). Second, the petitioner must demonstrate that "the controversy is capable of repetition and will evade review." Unistrut Corp. v. State Department of Labor and Training, 922 A.2d 93, 99 (R.I. 2007). "A case is 'capable of repetition yet evading review' if there is a 'reasonable expectation that the complaining party [or other similarly situated individuals] would be subjected to the same action again.'" Boyer v. Bedrosian, 57 A.3d 259, 281 (R.I. 2012) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)); see also State Department of Environmental Management v. Administrative Adjudication Division, 60 A.3d 921, 924-25 (R.I. 2012).

After a serious consideration of the record, it is our opinion that, even if we were to conclude that this case passes the threshold of extreme public importance, Briggs has not

sufficiently demonstrated that it is capable of repetition yet evading review. Briggs has not been readmitted to the Forensic Unit, and there is no indication in the record, nor was there any indication from Briggs's attorney at oral argument, to support a "reasonable expectation" that he will again be subjected to an emergency removal from the Forensic Unit back to the ACI. See Boyer, 57 A.3d at 281; see also Preiser v. Newkirk, 422 U.S. 395, 402-03 (1975) (prisoner's due process challenge, based on a previous transfer from a medium-security prison to a maximum-security prison that occurred without a hearing, was moot because his allegation of another likely transfer was based on mere speculation). Further, the record provides no support of subterfuge or cabal on the part of the department—it was Briggs, by his own actions, who created a danger to staff and other patients at the Forensic Unit to such a degree that the department sought his immediate transfer back to the ACI. Significantly, it was also Briggs who delayed his hearing by pursuing a review of the alleged procedural flaws during the emergency hearing.

In addition, until this case—according to the department's counsel—the department never had petitioned the Superior Court for the emergency transfer of a patient from the Forensic Unit back to the ACI and has not done so since. The Mental Health Advocate produced no evidence to the contrary. The absence of any meaningful evidence as to the likelihood of repetition would require us to engage in speculation and conjecture in order to find that the expectation to the mootness doctrine applies—and we decline to do so. Thus, we conclude that the "capable of repetition yet evading review" exception to mootness does not apply in this case.[13]

---

[13] We pause to question whether the initiation of this matter by faxed letter, rather than by petition as required by § 40.1-5.3-9, was proper, and, if not, whether the verified petition signed by the department's director on November 3, 2009—supplemented with supporting documents—cured any defects. We need not reach this issue, however, as Briggs's claim is moot and does not fall under the narrow mootness exception. Similarly, the Mental Health Advocate argues that

## 2
## Sanctions

Briggs also argues that the trial justice denied his motion for Rule 11 sanctions without providing a discussion of his reasoning and, therefore, that this issue should be remanded for further findings. The department, however, argues that the trial justice's decision to deny Rule 11 sanctions was supported by both the evidence and the law.

Under Rule 11, a trial justice has discretionary authority to formulate what he or she considers to be an appropriate sanction, but he or she must do so in accordance with the articulated purpose of the rule: "to deter repetition of the harm, and to remedy the harm caused." Pleasant Management, LLC, 918 A.2d at 217 (quoting Michalopoulos v. C & D Restaurant, Inc., 847 A.2d 294, 300 (R.I. 2004)). "As such, this Court will not reverse a trial justice's imposition [or denial] of sanctions for a litigant's misconduct unless 'the trial court based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Id. (quoting Michalopoulos, 847 A.2d at 300). Therefore, we will reverse a trial justice's decision regarding sanctions only if the trial justice has abused his discretion or is otherwise clearly wrong. Id.

The Mental Health Advocate—in only four sentences—argues that we should find that the trial justice abused his discretion because he declined to impose sanctions. However, he offers no substantive argument regarding the manner in which the trial justice may have abused his discretion. He simply argues that the trial justice denied the motion for Rule 11 sanctions "without discussion" and that the trial justice should have allowed his motion because "the way to deter future, exaggerated claims that the sky is falling is to sanction Chicken Little for

---

the trial justice should have analyzed the emergency transfer request under Rule 65 of the Superior Court Rules of Civil Procedure, because, he alleges, the trial justice entertained what was in substance a request for a temporary restraining order. This is also an issue we need not reach because Briggs's claim is moot.

- 13 -

improving on the facts extravagantly." In our view, this sparse assertion offers no reason for this Court to conclude that the trial justice abused his discretion in denying the Mental Health Advocate's motion. See State v. Day, 925 A.2d 962, 974 n.19 (R.I. 2007) ("A mere passing reference to an argument[,] * * * without meaningful elaboration, will not suffice to merit appellate review."); Wilkinson v. State Crime Laboratory Commission, 788 A.2d 1129, 1131 n.1 (R.I. 2002).

Moreover, after reviewing the record, we note that the trial justice did provide an extensive discussion about his assessment of the credibility of the witness testimony regarding the genuineness of the perceived emergency and safety concerns. After summarizing each witness's testimony, he concluded that "Dr. Tactacan's concern for the safety and security of the Forensic Unit and the staff and patients [wa]s also credible and sincere," "Nurse Benfante's distress [wa]s sincere," and "[t]he concern of Dr. Tate for the safety and security of the Forensic Unit and patients and staff in such Unit was credible and sincere." It was based on these reasons that the trial justice "decline[d] to find a conspiracy among [the department] staff and administration to remove [Briggs] from the Forensic Unit at any and all costs" and denied the motion for Rule 11 sanctions. Accordingly, because the Mental Health Advocate's naked asseveration, without substantiating authority, is insufficient to place an issue before this Court, we hold that there is no merit to this argument and that the Mental Health Advocate has failed to demonstrate that the trial justice abused his discretion when he denied his motion for Rule 11 sanctions.

## Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.

- 14 -



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        In re Irving Briggs.

**CASE NO:**        No. 2011-281-Appeal.
No. 2012-308-Appeal.
(PM 09-5598)

**COURT:**        Supreme Court

**DATE OPINION FILED:**        April 4, 2013

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ.

**WRITTEN BY:**        Associate Justice Francis X. Flaherty

**SOURCE OF APPEAL:**        Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice William E. Carnes, Jr.

**ATTORNEYS ON APPEAL:**

For Appellant:  John B. Lawlor, Jr., Esq.
Office of the Mental Health Advocate

For Appellee:  Dianne L. Leyden, Esq.
Department of Behavioral Healthcare,
Developmental Disabilities and Hospitals